1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   CARRIE L HUERTA,                     Case No.  1:22-cv-01350-BAM

12              Plaintiff,

13        v.                              **ORDER REGARDING PLAINTIFF'S**
                                          **MOTION FOR SUMMARY JUDGMENT**
14   MARTIN O'MALLEY, Commissioner of
     Social Security,[1]                  (Doc. 16)
15
16              Defendant.
17
18

19                            **INTRODUCTION**

20        Plaintiff Carrie L Huerta ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security ("Commissioner") denying her application for Widow's Benefits

22   and Disability Insurance under Title II of the Social Security.  The parties' briefing on the motion

23   was submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe.[2]  (Docs. 16, 20,

24   21.)  Having considered the parties' briefs, along with the entire record in this case, the Court finds

25

26   [1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted
27   for Kilolo Kijakazi as Defendant in this suit.
     [2] The parties consented to have a United States Magistrate Judge conduct all proceedings in this case,
28   including entry of final judgment, pursuant to 28 U.S.C. § 636(c).  (Docs. 7, 10, 11.)

                                          1

that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record and is based upon proper legal standards.  Accordingly, this Court will deny Plaintiff's motion for summary judgment and affirm the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

In April 2017, Plaintiff filed her first applications for disability, disability insurance benefits, and for widow's benefits under Title II of the Social Security Act, alleging disability beginning on January 1, 2012.  AR 58. [3]   That claim was denied initially on July 21, 2017, and upon reconsideration on November 30, 2017.  *Id.*  An ALJ held a hearing related to that claim on August 20, 2018, and issued a decision on that claim on February 26, 2019.  AR 55-70.  Plaintiff did not appeal this decision, making it the final decision of the Commissioner for the January 1, 2012, through February 26, 2019 period.

In August 2019, Plaintiff filed another application for disabled widow's insurance benefits, alleging disability beginning on February 27, 2019.  AR 210-263.  Plaintiff's application was denied initially on December 30, 2019, and upon reconsideration on May 1, 2020.  AR 71-94; 95-122. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ Vincent Misenti held a hearing on June 10, 2021.  AR 32-54.  ALJ Misenti issued an order denying benefits on the basis that Plaintiff was not disabled on July 23, 2021.  AR 12-31.  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied.  AR 1-11.  This appeal followed.

**June 10, 2021 Hearing Testimony**

ALJ Vincent Misenti held a telephonic hearing on June 10, 2021.  AR 32-54.  Robin Scher, an impartial vocational expert, also appeared and testified.  AR 47-52.  Plaintiff's attorney Jeff Milam was also present.  The ALJ began by admitting exhibits B1A through B10F into evidence.  AR 35.

Under examination by the ALJ, Plaintiff testified that she was 57 years old, weighed 165 pounds, and was 5'4" tall.  AR 36.  She further stated that she was right-handed, was a widow, and remained unmarried.  *Id.*  She testified that she lived in a house with her son and 15-month-old

---

[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

grandson.  *Id.*  Plaintiff further testified that she had a driver's license and drove approximately three times a week.  *Id.*  Plaintiff said that she went to school through the ninth grade and did not have a GED.  AR 36-37.  Plaintiff further clarified that she was alleging disability from February 27, 2019, one day after the prior ALJ decision.  AR 37.  Plaintiff stated that she had not worked at any job for wages or pay for more than 30 days since February 27, 2019.  *Id.*

Plaintiff testified that her hands, hip, and knee prevented her from working.  *Id.*  Plaintiff stated that she had greater difficulty with her left knee and with her left hip due to osteoarthritis.  *Id.*  Plaintiff testified that her symptoms included: hip pain; knee pain; back pain while walking; and numbness, pain, and tingling in her hands, fingers, and fingertips.  AR 38.  She said that she experienced these symptoms every day.  *Id.*  Plaintiff stated that she had not gotten treatment for her osteoarthritis prior to the hearing but that she would start therapy.  *Id.*  Plaintiff said that she was only taking Tylenol for her osteoarthritis.  *Id.*  She stated that her osteoarthritis "really hurts" and caused pain, and that she had had that problem for a few years.  *Id.*

Plaintiff stated that since the prior decision, she had developed a back impairment that may be causing her hip pain.  AR 38-39.  Plaintiff said that she did not have problems with her lumbar spine and the doctor told her it was from her backbone in the lower bottom.  AR 39.  Plaintiff's attorney clarified that the primary back problem is related to the lowest lumbar spine area and the hip.  *Id.*  Plaintiff said that she had not had treatment previously and that pain was her worst symptom.  *Id.*  Plaintiff added that she had pain in her lower back and that her hip pain aggravated her back pain.  AR 40.  She said that she has back problems every day and it is exacerbated by standing or walking.  *Id.*  To alleviate the pain, Plaintiff said that she would sit down for a while.  *Id.*  Plaintiff said that she saw Dr. Lopez at Paradise, and Plaintiff's attorney added that Dr. Crouse was the treating doctor, but that Dr. Lopez may have taken over.  AR 40-41.

Plaintiff stated that she had diabetes, but that she did not have problems from it that would limit her from working.  AR 41.  Plaintiff testified that she could sit about five minutes or ten minutes at one time and could stand for approximately five minutes at one time.  *Id.*  She said that she could walk for approximately five minutes and could lift four to five pounds.  *Id.*  Plaintiff noted that she was able to maintain her own personal appearance in terms of bathing, dressing, grooming, and

toileting.  *Id.*  She stated that she swept and mopped around the house and would clean, but that she needed breaks to do that.  *Id.*  She said that she had not cooked in a long time and would do the dishes but would need to stop for a while and sit down because her hands and hip would begin hurting.  AR 41-42.  Plaintiff said that she shopped for groceries, would water her plants, and would was the clothes.  AR 42.  Plaintiff said that she sometimes helped with the baby in dressing, feeding, and diapering, and would sometimes take care of the baby when he was asleep.  *Id.*  Plaintiff said that she did not take the baby anywhere other than some doctor's appointments.  She said that she did not help with bathing him or brushing his teeth and did not lift him up and carry him.  *Id.*  Plaintiff said that when she left her house, she would go to the nearby store.  AR 42-43.  Plaintiff testified that when she drove, it was either to the store or doctor's appointments.  AR 43.

Upon examination by her attorney, Plaintiff stated that Plaintiff stated that she was taking Tylenol for pain medication, but also took 20 to 25 other medications daily for her diabetes, cholesterol, high blood pressure, blood flow, and depression.  *Id.*  Plaintiff said that she had surgery for her heart where they "unplugged the vein in [her] right leg," and said that she still had pain in that right leg occasionally.  *Id.*  Plaintiff said that if she had a job where she would need to stand all day, it would bother her leg and cause pain.  AR 44.  Plaintiff said that she did not have problems with breathing, but that a chest x-ray showed that she had a lump in her chest.  *Id.*  Plaintiff stated that she used inhalers for walking.  *Id.* She said that she thought if she were walking around all day in the dust, she would have breathing problems and would also have breathing problems if she were walking around all day inside.  AR 45.  Plaintiff further said that she was fatigued from her impairments.  *Id.*

Plaintiff stated that her depression had stayed the same but noted that when she got the decision from the last judge denying her application, her depression got worse.  *Id.*  Plaintiff said that she was still getting mental health treatment on a regular basis and said that she did not think she could emotionally handle working outside of the house five days per week.  AR 45-46.  Plaintiff said she had days where she was supposed to go out but did not because she felt bad from her depression and had problems concentrating due to her depression causing her mind to go blank.  AR 46.  Plaintiff said that her mind went blank for a minute during the hearing.  *Id.*  Plaintiff said that she had tingles in her legs and feet, but not swelling.  *Id.*  Plaintiff said that her pain was "real bad" and was getting worse.  *Id.*

Upon reexamination by the ALJ, Plaintiff said that she was cutting down to four or five cigarettes a day.  *Id.*  She said that in 2020, she smoked a whole pack a day.  AR 46-47.  Plaintiff said that she had not noticed any improvement in breathing since cutting back on cigarettes.  AR 47.  Plaintiff said that she was using an inhaler in 2020 and then the last time she used one was at the beginning of 2021.  *Id.*  Plaintiff said that she did not consume any alcohol.  *Id.*

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") Robin Scher.  AR 47-52.  The VE testified that he had read the portion of the file pertaining to past work and summarized Plaintiff's past work as Electronics Inspector (DOT No. 726.684-022, light strength level, SVP 3).  AR 48.  The VE stated that his testimony was consistent with the DOT.  *Id.*  The ALJ then asked Plaintiff when she last worked as an electronics inspector, and she said that it had been more than 15 or 20 years, so the ALJ stated that they would exclude that work.  AR 49.

The ALJ then asked the VE hypothetical questions.  For the first hypothetical, the ALJ asked the VE to consider a hypothetical individual with no past work experience, with a ninth grade limited education, who could perform a medium range of work, but was limited to: frequent bilateral handling and fingering; frequent climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling; no climbing of ladders and scaffolds; understanding and carrying out simple, routine and repetitive tasks and using judgment limited to simple work-related decisions; and no work around unprotected heights.  AR 49-50.  The VE and ALJ then discussed Plaintiff's past work and the ALJ noted that they would consider the past work as Plaintiff had FICA earnings from 2005 through 2009.  AR 50.  The VE then classified Plaintiff's past work as Electronics Inspector (DOT No. 726.684-022, light strength level, SVP 3) and stated that his testimony was consistent with the DOT.  AR 51.  Plaintiff testified that she only got to ninth or tenth grade, and the ALJ noted that they would use limited education in the hypotheticals.  *Id.*  Given that hypothetical individual, the VE noted that jobs in the national economy included Cleaner, Housekeeping (DOT No. 323.687-013, light strength level, SVP 2).  *Id.*  The ALJ noted that the hypothetical individual could perform a medium range of work.  *Id.*  The VE then found that jobs in the national economy would include: Counter Supply Worker (DOT No. 319.687-010, medium strength level, SVP 2, with approximately 37,000 jobs nationally); Floor Waxer (DOT No. 381.687-034, medium strength level, SVP 2, with approximately 118,000 jobs nationally);

and Assembler, Motor Vehicle (DOT No. 806.684-010, medium strength level, SVP 2, with approximately 214,000 jobs nationally).  AR 51-52.  The VE noted that his testimony was consistent with the DOT.  AR 52.

For the second hypothetical, the ALJ asked the VE to assume an individual who was limited to five pounds of lifting total; and standing, walking, and sitting for no more than one hour total per task. *Id.*  The VE testified that there would be no full-time work for that individual.  *Id.*

The ALJ and Plaintiff's attorney then verified that the earnings discussed previously were Plaintiff's.  AR 52-53.  Plaintiff's attorney closed by: asking significant weight be given to Dr. Clouse's opinion in Exhibit 9F, noting that there were new problems at issue, requesting that the ALJ consider reopening the prior decision, stating that Plaintiff had a treating doctor who said Plaintiff would grid out if she cannot do past relevant work at the sedentary level, and concluding that Plaintiff could not sustain work at step five due to her leg and other limitations.  AR 53-54.

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  AR 12-31.  Specifically, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 27, 2019, the alleged onset date.  AR 18.  The ALJ identified the following severe impairments: degenerative disc disease; osteoarthritis; peripheral vascular disease; and depression.  *Id.*  The ALJ also identified nonsevere impairments of diabetes mellitus, hyperlipidemia, and hypertension, which he said to be well controlled with medication, asymptomatic, and without complications.  *Id.*  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  AR 19-21.

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform medium work with the limitations that Plaintiff can: frequently balance, stoop kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds or work at unprotected

heights; frequently handle and finger with her bilateral upper extremities; perform simple, routine and repetitive tasks; and use judgment to make simple work-related decisions.  AR 21-25.  The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion(s) and prior administrative medical finding(s)."  AR 21; 21-25.

Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work.  AR 25.  However, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  AR 25-26.  The ALJ noted that examples of jobs consistent with Plaintiff's age, education, work experience, and RFC included: (1) Counter Supply Worker (DOT No. 319.687-010, medium, unskilled (SVP 2), with 37,000 jobs in the national economy); (2) Floor Waxer, (DOT No. 381.687-034, medium, unskilled (SVP 2), with 118,000 jobs in the national economy); and (3) Motor Vehicle Assembler (DOT No. 806.684-010, medium, unskilled (SVP 2), with 214,000 jobs in the national economy).  AR 26.  The ALJ therefore concluded that Plaintiff had not been disabled from February 27, 2019, through the date of the decision.  *Id.*

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards,

1    and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of*
2    *Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

3                                                    **REVIEW**

4            In order to qualify for benefits, a claimant must establish that he or she is unable to engage in
5    substantial gainful activity due to a medically determinable physical or mental impairment which has
6    lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §
7    1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such
8    severity that he or she is not only unable to do his or her previous work, but cannot, considering his or
9    her age, education, and work experience, engage in any other kind of substantial gainful work which
10   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The
11   burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.
12   1990).

13                                                 **DISCUSSION**[4]

14           Plaintiff first argues that the ALJ's finding that Plaintiff could perform a wide range of
15   medium work was results-driven as Plaintiff was a person of advanced age with a limited education
16   and would grid as disabled if she could only perform light work.  (Doc. 16 at 9-10.)  Plaintiff next
17   contends that the ALJ erred in considering the medical source opinion of Dr. Flor Lopez Flores.  (Doc.
18   16 at 10-14.)  Plaintiff further contends that the ALJ failed to develop the record.  (Doc. 16 at 14-15.)
19   Plaintiff also argues that the ALJ based his mental RFC finding on his own lay interpretation of
20   insufficient evidence.  (Doc. 16 at 15-17.)  Plaintiff finally asserts that the ALJ committed harmful
21   error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as
22   inconsistent with the evidence.  (*Id.* at 17-19.)

23           **A.      Grids Evaluation**

24           Plaintiff first argues that the ALJ's findings that Plaintiff could perform a wide range of
25   medium work was results-driven as Plaintiff was a person of advanced age with a limited education

---

27   [4] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including
     arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific
28   argument or brief is not to be construed that the Court did not consider the argument or brief.

and would grid as disabled if she could only perform light work.  (Doc. 16 at 9-10.)  Defendant responds that the grids would only act as a guide given Plaintiff's additional physical and mental limitations; an individual of advanced age with limited education and semi-skilled past relevant work could still be deemed not disabled at the light exertional level under the Grid if the individual had transferable skills; and there is no evidence showing that the ALJ's findings were results-driven. (Doc. 20 at 10.)

"The Grids were designed to relieve the Commissioner of the need to rely on a vocational expert in every case to establish the number of jobs available to a person with the claimant's physical ability, age, education, and work experience."  *Barnes v. Berryhill*, 895 F.3d 702, 705 (9th Cir. 2018) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)).  The Ninth Circuit has noted, however, that "not all claimants fit neatly into the categories established by the Grids" and that "significant 'non-exertional limitations' such as 'pain, postural limitations, or environmental limitations' that do not result in strength limitations may 'limit the claimant's functional capacity in ways not contemplated by the guidelines.'"  *Id.* at 706 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999)).  In those situations, "[r]eliance on the Grids alone will then be inappropriate. Instead, the ALJ must determine, in consultation with a VE, which jobs a claimant can still perform 'considering his or her age, education, and work experience, including any transferable skills or education providing for direct entry into skilled work.'"  *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 201.00(h)(3)).  The Ninth Circuit cautioned that while the Grids may assist the ALJ by establishing a universe of unskilled positions, "the Grids can never direct a conclusion of not disabled for a claimant with significant additional limitations not contemplated by the Grids."  *Id.* (citing *Lounsburry v. Barnhart*, 468 F.3d 1111, 1116 (9th Cir. 2006)).

As discussed further below, the ALJ evaluated Plaintiff's impairments and the record, then formulated an appropriate RFC that included some physical and mental limitations.  The ALJ then noted that if "the claimant had the residual functional capacity to perform the full range of medium work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.12. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  AR 26.  The ALJ considered the Grids but followed the Ninth

Circuit's holding that the Grids cannot direct a conclusion of not disabled for a claimant with significant additional limitations not contemplated by the Grids. *Barnes*, 895 F.3d at 706.  The ALJ therefore did not err in his Grids assessment.

**B.      Medical Opinion Evidence**

Because Plaintiff applied for benefits after March 27, 2017, her claim is governed by the agency's new regulations concerning how an ALJ must evaluate medical opinions.  20 C.F.R. § 404.1520c.   Under the new regulations, the Commissioner does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The Commissioner evaluates the persuasiveness of the medical opinions based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)-(5).  Supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

Ninth Circuit case law preceding the new regulations afforded deference to the medical opinions of treating and examining physicians.  Indeed, prior to the current regulations, the Ninth Circuit required ALJs to provide clear and convincing or specific and legitimate reasons for rejecting the medical opinions of treating or examining physicians.  These standards of articulation no longer apply in light of the new regulations, and the ALJ was not required to provide "specific and legitimate reasons" to discount the medical opinions.  *See Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (finding revised social security regulations "clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant").  However, the Ninth Circuit has clarified that "under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  *Id.*  "The agency must 'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and

'explain how [it] considered the supportability and consistency factors' in reaching these findings."

*Id.* (internal citations omitted); *see* 20 C.F.R. § 404.1520c(c).  In this context,

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant ... objective medical evidence." Id. § 404.1520c(c)(1). Consistency means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim." Id. § 404.1520c(c)(2).

*Id*. at 791-92.

    1.  Opinion of Dr. Flor Lopez Flores

Plaintiff contends that the ALJ erred by improperly discounting the opinion of Dr. Flor Lopez Flores.  (Doc. 16 at 10-14; Doc. 21 at 1-4.)

On May 21, 2021, Dr. Lopez Flores completed a document titled "Questionnaire – Physical with Emphasis on Hand Impairments."  AR 642-43.  On the form, Dr. Lopez Flores first marked that the medical problems for which Dr. Flores had treated the claimant preclude her from performing any full-time work at any exertion level, including the sedentary level (defined by Social Security as lifting no more than 10 pounds, sitting for 6 hours in an 8-hour workday, and standing/walking for 2 hours in an 8-hour work day).  AR 642.  Dr. Lopez Flores then wrote that Plaintiff's primary impairments were Osteoarthritis; Arthritis of hands; Peripheral vascular disease with claudication; and bilateral hand carpal tunnel syndrome.  *Id.*  Dr. Lopez Flores noted that this opinion was based upon objective findings including "limited range of motion of the wrists, fingers, and left leg/hip with severe tenderness to palpation."  *Id.*  Dr. Lopez Flores opined that Plaintiff did not need to lie down or elevate her legs and during an eight-hour workday, Plaintiff was able to sit for one to two hours and stand or walk for one hour.  *Id.*  Dr. Lopez Flores also opined that Plaintiff's additional work limitations included severe bilateral hand and wrist pain.  *Id.*  Plaintiff's diagnosis was listed as "Arthritis & Carpal Tunnel Syndrome" with the left and right hand affected.  *Id.*  Dr. Lopez Flores wrote that clinical abnormalities included positive Tinel and Phalen tests, a pending EMG, and an MRI from 2017 showing hips arthritis and degenerative changes in the lumbar spine.  *Id.*  Dr. Lopez Flores opined that Plaintiff could lift five pounds frequently during a workday and could lift up to five pounds occasionally during a workday.  AR 643.  Dr. Lopez Flores further opined that, based upon Plaintiff's history, she could only reach or grasp, handle, push or pull, and do fine finger manipulation

for less than one hour in an eight-hour workday due to pain, but had no restriction on feeling.  *Id.*  Dr. Lopez Flores also opined that Plaintiff could reach or grasp, handle, feel, push or pull, and do fine finger manipulation for less than one hour at a time before needing to rest her hands.  *Id.*  Dr. Lopez Flores concluded that Plaintiff had been disabled to the degree discussed for, "based on records at least 3 years." *Id.*

In evaluating the opinion, the ALJ summarized and reasoned as follows:

> Flor Lopez Flores, M.D., the claimant's own medical source, opined the claimant is able to lift no more than five pounds, sit less than two hours in an eight-hour workday, and walk one hour in a workday. He further opined the claimant can reach, grasp, push, pull, and perform fine finger manipulation less than one hour in a workday (Ex. B9F). This opinion is not consistent with the evidence and of no persuasive value. First, the opinion is poorly supported, as the purported observations, such as severe tenderness, severe hand and wrist pain, and positive Tinel's and Phalen's signs, do not appear in Dr. Lopez Flores's relatively benign treatment notes. Further, the imaging upon which he purports to rely showed only mild degenerative changes in the claimant's hands and sacroiliac joints. Moreover, limitations to lifting only five pounds, and sitting/standing/walking less than a combined three hours in a day, are consistent with a level of debilitation that finds no support in the evidence. Rather, they are wholly inconsistent with observations of normal strength and range of motion, independent ambulation with a normal gait, good heart function, and the ability to make a fist, despite only limited conservative treatment (E.g. Ex. B1F; B5F; B7F; B8F; B10F/150-200).

AR 24-25.

The Court finds that the ALJ properly evaluated Dr. Lopez Flores's opinion under the new regulations.  First, the ALJ's reasoning regarding the evidence and noting that the limitations are inconsistent with higher level of debilitation invokes the consistency factor, which means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim."  *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(2)).

In contrast with Dr. Lopez Flores's opined limitations, the ALJ noted that the "limitations to lifting only five pounds, and sitting/standing/walking less than a combined three hours in a day, are consistent with a level of debilitation that finds no support in the evidence" and "are wholly inconsistent with observations of normal strength and range of motion, independent ambulation with a

normal gait, good heart function, and the ability to make a fist, despite only limited conservative treatment." AR 24-25. In support, the ALJ cited Plaintiff's treatment records from the County of Stanislaus Health Service generally showing generally normal findings with occasional abnormal hand-related findings. *See, e.g.* AR 344 (April 2019 report noting normal heart and lung findings, musculoskeletal range of motion is within normal limits for shoulders, elbows, knees, ankles, and feet and no swelling or tenderness noted; range of motion normal for right wrist; no obvious swelling but tenderness in left wrist; tenderness in right and left hand but "Fist making is 100%"); 346 (February 2019 x-ray report for hands noting normal bone density, no acute fracture, normal joint findings with mild degenerative changes in the interphalangeal joints, normal soft tissues findings, and an impression of "No acute osseous abnormality of both hands"); 351 (March 2019 report noting "she appears to have early RA" but noting "X rays of hands did not show any erosive changes"); 354 (September 2019 report noting "heart size and pulmonary vascularity appear normal" but some calcifications, "no lytic or blastic lesions of bone" but diffuse degenerative disc disease demonstrated throughout spine and small posterior osteophytes from posterior disc protrusions in mid thoracic region); 378 (November 2019 physical exam findings note generally well developed and in no acute distress, lungs clear bilaterally, and heart has regular rate and rhythm without murmurs, rubs, or gallops); 398 (March 2019 physical exam noting "inability to flex fingers fully, tenderness to palpation, weak grasp strength, no significant edema or nodules" and "pulses intact"); 404 (January 2019 physical exam showing normal general, lungs, and heart findings; and normal full range of motion of all joints); 502 (January 2020 physical exam noting normal general, lungs, and heart findings; "bilateral mild swan-neck deformities of fingers"); 516 (December 2019 physical exam noting normal general, lungs, and heart findings); 536 (March 2020 normal, negative physical exam findings except for positive neck test result). The ALJ further cited Paradise Medical Office and Valley Heart Institute treatment records showing generally normal heart, lung, muscle, bone, and other findings that contrast with Dr. Lopez Flores's greater limitations. *See* AR 551 (October 2020 report noting "cranial nerves II-XII grossly intact with normal sensation, reflexes, coordination, muscle strength and tone," normal general, lungs, and heart findings); 562 (May 2020 physical exam showing normal general, lungs, and heart findings); 569 (May 2020 CT report showing lungs are normal aside

from triangular-shaped subpleural pulmonary nodule, normal heart findings, and bone findings show "osseus structures are intact"); 575 (February 2021 report noting no "bony abnormalities are seen" in bones; some calcified atherosclerotic disease affecting coronary arteries; nodule in lungs); 593 (April 2021 findings noting normal lungs, extremities findings); 609 (February 2021 report noting negative findings and "Level of Distress - Awake / Alert, No Acute Distress. Nourishment - Well Nourished. Appearance - Well Developed."). The ALJ additionally reviewed City Psychology, Inc. treatment notes with weekly reports from September 2020 to May 2021 that showed normal findings as to Plaintiff's orientation, general appearance, and behavior, and that Plaintiff's motor activity was "unremarkable." AR 797; 799; 801; 803; 805; 807; 809; 811; 813; 815; 817; 819; 821; 825; 827; 829; 832; 834; 836; 838; 840; 842; 844; 846; 848. The ALJ drew extensively from treatment notes and considered Dr. Lopez Flores's limitations within the context of the broader medical record. The ALJ therefore properly considered the consistency factor.

Second, the ALJ found that the "purported observations, such as severe tenderness, severe hand and wrist pain, and positive Tinel's and Phalen's signs, do not appear in Dr. Lopez Flores's relatively benign treatment notes" and further noted that "the imaging upon which he purports to rely showed only mild degenerative changes in the claimant's hands and sacroiliac joints." AR 24. The ALJ's addressing of Dr. Lopez Flores's treatment notes invokes the supportability factor, which means the "extent to which a medical source supports the medical opinion by explaining the 'relevant ... objective medical evidence.'" *Woods*, 32 F.4th at 791-92. (citing 20 C.F.R. § 404.1520c(c)(1)).

Here, the results of physical exams performed by Dr. Lopez Flores in the record show relatively normal results that contrast with the greater limitations opined. AR 593 (March 2021 physical exam by Dr. Lopez Flores notes findings that Plaintiff is well developed and well nourished, lungs were clear, regular heart and extremities findings, and "Preserved sensation and strength"); 599 (January 2021 physical exam by Dr. Lopez Flores notes findings that Plaintiff is well developed and well nourished, lungs were clear, regular heart and extremities findings, and "Preserved sensation and strength"). The problems discussed at these visits were related to diabetes, hypertension, and lung field nodules. AR 591-595 (March 2021 report discussing problems of diabetes mellitus which was noted as chronic and non-stable and essential hypertension which was noted as chronic and stable);

596-602 (January 2021 visit report discussing problems of diabetes mellitus and lung field nodules related to heavy smoking history).  Furthermore, the Court cannot locate treatment notes referred to in Dr. Lopez Flores's opinion showing objective findings of severe tenderness, severe hand and wrist pain, and positive Tinel's and Phalen's tests.  Additionally, while Dr. Lopez Flores refers in his opinion to a 2017 MRI related to arthritis and the lumbar spine, the Court cannot locate that MRI within the record, and the imaging reports in the record shows generally normal findings despite an impression identifying moderate to severe spondyloarthropathy in a February 2019 report.  AR 348 (February 2019 report noting "Moderate to severe spondyloarthropathy throughout the lumbar spine, particularly at the lower levels," some normal osseous mineralization, mild degenerative changes of joints and mild vascular calcifications); 351 (March 2019 report noting "X rays of hands did not show any erosive changes," also that given Plaintiff's symptoms and "positive RF," she appears to have early Rheumatoid Arthritis).  The ALJ therefore properly assessed the supportability factor as part of the analysis discounting Dr. Lopez Flores's opinion.  Because the ALJ appropriately addressed the consistency and supportability factors in discounting Dr. Lopez Flores's opinion, the ALJ did not err in evaluating this medical opinion.

Defendant argues that when discussing Dr. Lopez Flores's opinion, the ALJ gave short shrift to evidence of Plaintiff's hand limitations and omitted discussion of other clinical evidence that supports and is consistent with Dr. Lopez Flores's opinion.  (Doc. 16 at 12-13.)  However, as discussed above, the ALJ cited to numerous records across multiple years that showed relatively normal findings. While Plaintiff puts forward her interpretation of the record, where "evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Woods*, 32 F.4th at 788 (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Plaintiff's alternate interpretation of the record therefore does not demonstrate that the ALJ erred.

### C. Duty to Develop the Record

Plaintiff further contends that the ALJ failed to develop the record.  (Doc. 16 at 14-15.) Plaintiff specifically suggests, without evidence, that there must be a missing May 2021 office note

1    and a missing MRI report upon which Dr. Lopez Flores based her opinion.  (*Id.* at 14.)  Plaintiff

2    further contends that the ALJ mischaracterized the evidence in the February 2019 lumbar x-ray report.

3    (*Id.*)  Defendant responds that Plaintiff did not request that the record remain open at the hearing, did

4    not ask for assistance with acquiring that evidence, and has not presented alleged evidence to the

5    Court for consideration.  (Doc. 20 at 17.)  Defendant further argues that imaging findings cannot act as

6    a substitute for physical examination findings.  (Doc. 20 at 22 n. 11).

7        "An ALJ's duty to develop the record further is triggered only when there is ambiguous

8    evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Mayes v.*

9    *Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); see also *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir.

10   2020) (finding further development unnecessary when the available record included years of mental

11   health records and multiple opinions from non-examining medical providers).  Here, the ALJ had no

12   duty to further develop the record based upon allegedly missing documents, as the record had

13   previously been developed, Plaintiff was represented by counsel at the hearing and had an opportunity

14   to discuss or supplement the record, extensive treatment notes and evidence were examined by the

15   ALJ in assessing Dr. Lopez Flores's opinion, and the evidence was not particularly ambiguous.

16       Regarding Plaintiff's argument that the ALJ mischaracterized the x-ray results as showing only

17   "moderate disc disease of the lumbar spine," Plaintiff is correct that the "impression" listed in the

18   report is: "Moderate to severe spondyloarthropathy throughout the lumbar spine, particularly at the

19   lower levels."  AR 348.  However, the findings also note "osseous mineralization is normal" and

20   "Mild degenerative changes of the… joints" and "Mild vascular calcifications."  *Id.*  Furthermore, this

21   imaging report was part of the broader supportability discussion and Plaintiff does not show that the

22   ALJ's description of the evidence created a harmful error.  (*See* Doc. 16 at 14-15); *Edgecomb v.*

23   *Colvin*, 671 F. App'x 517, 518 (9th Cir. 2016) (finding that failure to discuss an MRI "does not

24   warrant reversal. It contains no information regarding [claimant] functional limitations. Rather, it

25   provides information already accepted by the administrative law judge: that [claimant] has severe

26   degenerative disc disease. The question is what functional limitations that disease places on his ability

27   to work. The 2011 MRI does not answer that question. Accordingly, the ALJ did not err in failing to

28   mention it and, even if he did, that failure was harmless.").

**D.     RFC Assessment**

Plaintiff also argues that the ALJ based his mental RFC finding on his own lay interpretation of insufficient evidence.  (Doc. 16 at 15-17; Doc. 21 at 4-5.)

An RFC "is the most [one] can still do despite [his or her] limitations" and it is "based on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of evidence. 20 C.F.R. § 404.1545(a)(1). Indeed, "an ALJ's RFC determination need not precisely reflect any particular medical provider's assessment." *Pinto v. Kijakazi*, No. 1:21-cv-00585-SKO, 2022 WL 17324913, at *9 (E.D. Cal. Nov. 29, 2022) (citing *Turner v. Comm'r Soc. Sec. Admin.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010)); see also *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding RFC determination need not directly correspond to a specific medical opinion). The Ninth Circuit has also made clear that "it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).

Plaintiff contends that because the ALJ rejected the opinions of the state agency physicians, the ALJ was left with an evidentiary deficit as to Plaintiff's mental functioning.  (Doc. 16 at 16.) However, this misstates the ALJ's actions in assessing the medical opinions and formulating Plaintiff's RFC.  The ALJ noted that the state "medical consultants H. Amodo, M.D., and Pauline Hightower, Psy.D., opined that the claimant's mental impairment is nonsevere."  AR 24.  The ALJ then found the opinions "somewhat persuasive, as they are well supported by the consultants' detailed explanations" and "also are relatively consistent with the medical evidence showing good results with treatment, and observations showing the claimant to be alert and oriented, and cooperative, with good grooming and hygiene, normal behavior, intact memory and concentration, independent activities of daily living, and the ability to care for a young infant."  *Id.*  However, the ALJ found that some abnormalities including disorganized cognitive function and limited judgment and insight, and "added mental restrictions out of an abundance of caution."  *Id.*

The ALJ appropriately assessed each of these opinions based upon their consistency with the overall record and their supportability based upon the medical consultants' review of their own medical findings.  *See* AR 24; 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2) ("Supportability and consistency are the most important factors."). Rather than being left with an

evidentiary deficit, the ALJ had the state agency consultants' records and opinions, supported by their findings and the broader medical record.  The ALJ then considered these opinions along with other evidence in the record in formulating the RFC.  *See Pinto*, 2022 WL 17324913, at *9.  The ALJ was therefore not left with an evidentiary deficit regarding Plaintiff's mental impairments and was not required to have the RFC specifically match specific medical opinions.  Rather than improperly substituting his own opinion, the ALJ appropriately considered the opinions of the state agency consultants and Plaintiff's medical source Dr. Lopez Flores as well as Plaintiff's treatment records in formulating the RFC.  AR 21-25.  Accordingly, the ALJ did not err in formulating the RFC.

### E.  Plaintiff's Subjective Complaints

Plaintiff next contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence.  (Doc. 16 at 17-19; Doc. 21 at 6.)  In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004).  First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1015.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  AR 22.  However, the ALJ discounted Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, noting that the statements were not consistent with medical evidence and other evidence in the record.  *Id.*  The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

First, the ALJ found that Plaintiff's subjective symptoms were inconsistent with the medical evidence.  *Id.*  Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

Regarding Plaintiff's degenerative disc disease, the ALJ noted that February 2019 x-rays showed moderate degenerative disc disease of the claimant's lumbar spine and mild degenerative changes in Plaintiff's sacroiliac joints, and the record includes observations of left hip pain, tenderness, and decrease range of motion.  AR 22; 348 February 2019 report noting moderate to severe degenerative disc disease of lumbar spine and mild degenerative joint changes and mild vascular calcifications); 614 (September 2020 report noting "She has not been doing much walking due to left hip pain. Denies any claudication symptoms."); 642 (noting May 2021 questionnaire noting "limited range of motion of the wrists, fingers, and left leg/hip with severe tenderness to palpation"). However, the ALJ also noted that treatment notes following conservative treatment showed that Plaintiff could walk independently with a normal gait and exams showed normal strength, sensation, and range of motion throughout Plaintiff's extremities with no clubbing, cyanosis, edema, or deformity.  AR 22; *see* 341 (September 2019 physical exam noting musculoskeletal findings as negative with "Overall – No Deformity. Gait – Normal. Rheumatoid Arthritis – Absent."); 387 (September 2019 report noting no acute distress, regular lungs and heart findings); 508-509 (December 2019 report noting "no edema BLE"); 536 (March 2020 report noting "Gait – Normal," no cyanosis); 551 (October 2020 exam report noting "no focal deficits, cranial nerves II-XII grossly intact with normal sensation, reflexes, coordination, muscle strength and tone"); 599 (January 2021 exam report noting "No LE edema," preserved sensation and strength, regular general, lungs, and heart findings); 607 (February 2021 report noting negative findings for claudication, edema, joint pain, myalgia).  Given these relatively normal findings, the ALJ appropriately assessed the medical evidence regarding degenerative disc disease in contrast to Plaintiff's allegations of disabling symptoms.

Regarding Plaintiff's osteoarthritis and reported bilateral hand pain, the ALJ noted that February 2019 hand x-rays showed only mild degenerative changes and were otherwise unremarkable; and testing revealing positive rheumatoid factor was noted to be consistent with potential early rheumatoid arthritis.  AR 351 (March 2019 report noting "X rays of hands did not show any erosive changes… Given her symptoms and positive RF, she appears to have early RA"); 344 (April 2019 report noting normal heart and lung findings, musculoskeletal range of motion is within normal limits

for shoulders, elbows, knees, ankles, and feet and no swelling or tenderness noted; range of motion normal for right wrist; no obvious swelling but tenderness in left wrist; tenderness in right and left hands but "Fist making is 100%"); 341 (September 2019 physical exam noting musculoskeletal findings as negative with "Overall – No Deformity. Gait – Normal. Rheumatoid Arthritis – Absent."); 398 (March 2019 physical exam noting "b/l [hands] inability to flex fingers, tenderness to palpation, weak grasp strength, no significant edema or nodules, pulses intact."); 502 (January 2020 exam noting "bilateral swan-neck deformities of fingers"); 618 (March 2020 physical exam noting "Overall – No Deformity. Gait – Normal. Rheumatoid Arthritis – Absent.").  The ALJ therefore properly concluded that, "[u]ltimately, there is little medical evidence showing poor grip strength, decreased manipulative skills, or other findings that would support the claimant's allegations."  AR 23.

Regarding Plaintiff's peripheral vascular disease, the ALJ first noted that a 2014 stress myocardial perfusion study and echocardiogram were within normal limits and a 2015 Carotid Doppler study showed no significant carotid artery disease.  AR 338.  The ALJ also noted that a November 2019 echocardiogram was unremarkable other than some mild mitral valve and tricuspid regurgitation.  AR 638-39 (noting most findings within normal limits except for mild mitral valve regurgitation and mild tricuspid regurgitation).  Furthermore, the ALJ noted that Plaintiff consistently denied chest pain, palpitations, and shortness of breath.  *See, e.g.,* AR 338 (September 2019 visit report "post atherectomy of the right anterior tibial artery and tibial peroneal trunk," noting Plaintiff denied chest pressure or tightness, shortness of breath, leg swelling, orthopena, or paroxysmal nocturnal dyspnea); 403 (January 2019 report noting Plaintiff denied shortness of breath, wheezing, and chest pain or discomfort); 554 (June 2020 report noting "denies tingling, numbness, edema, chest pain, sob, fever, cough, melena, dysuria").  The ALJ also noted that observations revealed regular rate and rhythm with no murmur, gallop, or rub.  *See, e.g.,* AR 341 (September 2019 physical exam noting negative cardiac and vascular findings, normal rhythm, heart sounds, palpation, and no extra sounds); 387 (September 2019 report noting regular rate and rhythm without murmurs, rubs, or gallops for heart findings and normal general and lung findings); (October 2020 report noting heart findings with regular rate and rhythm without murmurs, rubs, or gallops, normal lungs, neurological, psych, and abdomen findings).  Finally, the ALJ found that Plaintiff was stated to be asymptomatic from a cardiac

standpoint.  AR 341 (September 2019 report noting "she is asymptomatic from cardiac standpoint");

614 (September 2020 report noting "she is asymptomatic from cardiac standpoint").  The ALJ

therefore properly assessed whether Plaintiff's symptoms allegations were supported by the medical

evidence regarding her peripheral vascular disease.

Regarding Plaintiff's depression, the ALJ noted that the record showed diagnoses of

depression, reports of being depressed and anxious when dealing with life stressors, and mental status

examinations showed evidence of disorganized cognitive functioning and limited judgment and

insight.  AR 23; *see, e.g.* AR 421 (February 2019 progress note finding cognitive functioning is

"disorganized" but functional status is "intact," noting Plaintiff's anxiety related to social security

decision and son's probation violation); 426 (March 2019 progress note finding cognitive functioning

is "disorganized" but functional status is "intact"); 796-97 (August and September 2020 reports noting

Plaintiff was "Anxious, depressed and difficulty adjusting to social isolation," insight and

judgment/impulse control was poor, and functional status was moderately impaired).  However, the

ALJ also noted that mental status examinations showed Plaintiff was alert and oriented, appropriately

groomed and dressed, cooperative, had a normal mood and affect, and exhibited appropriate behavior.

AR 23; *see, e.g.* AR 551 (October 2020 report noting "alert and cooperative; normal mood and affect;

normal attention span and concentration."); 593 ("appropriate mood and affect"); 599 (January 2021

report noting "appropriate mood and affect"); 609 (February 2021 visit report noting "Level of

Distress - Awake / Alert, No Acute Distress. Nourishment - Well Nourished. Appearance - Well

Developed."); 797 (September 12, 2020 report noting normal findings as to orientation, general

appearance, dress, motor activity, interview behavior, memory, thought process, and perception;

though poor insight and judgment and preoccupied thought content and stating functional status is

moderately impaired).  The ALJ further noted that exams showed intact attention, concentration, and

memory.  AR 23; 551 October 2020 report noting "alert and cooperative; normal mood and affect;

normal attention span and concentration."); 605 (November 2020 report noting "alert and cooperative;

normal mood and affect, normal attention span and concentration."); 799 (September 25, 2020 report

noting normal findings as to orientation, general appearance, dress, motor activity, interview behavior,

memory, thought process, and perception; attention/concentration is "variable; poor insight and

judgment and preoccupied thought content and stating functional status is moderately impaired).  The

ALJ also noted that there was no evidence of Plaintiff having hallucinations, delusions, or suicidal or

homicidal ideation.  *See* AR 801 (October 9, 2020 progress note noting client denies all areas of risk);

817 (December 11, 2020 progress note stating client denies all areas of risk); 840 (April 16, 2021

progress note stating client denies all areas of risk).  The ALJ therefore assessed a range of medical

findings to determine whether Plaintiff's symptoms allegations were supported.

     In short, the ALJ examined the record regarding Plaintiff's impairments, and appropriately

evaluated Plaintiff's symptoms in light of the objective supporting evidence.  Accordingly, the ALJ

appropriately discounted Plaintiff's subjective symptoms testimony based upon the lack of supporting

medical evidence.

     Second, the ALJ considered that, prior to Plaintiff's impairments were well-controlled with

conservative treatment and medication.  AR 22-24.  "Impairments that can be controlled effectively

with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v.*

*Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th

Cir. 2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *Odle v. Heckler*, 707 F.2d 439, 440

(9th Cir. 1983)); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated

that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding

severity of an impairment.") (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995)).

     Regarding Plaintiff's degenerative disc disease, the ALJ noted that Plaintiff's treatment has

been conservative and Plaintiff was treated with NSAID pain medication and muscle relaxers,

although she appeared to rely primarily on over-the-counter medication for pain.  AR 339 (September

2019 report noting medications included Aspirin and Baclofen); 43 (Plaintiff stated that she was taking

Tylenol as pain medication).  The ALJ found that Plaintiff reported doing well with this conservative

treatment, denying joint pain and myalgia and exercising three times per week.  AR 22; *see*

341(September 2019 physical exam noting musculoskeletal findings as negative with "Overall – No

Deformity. Gait – Normal. Rheumatoid Arthritis – Absent."); 511 (February 2019 report noting

intermittent lower back pain but denied radiating pain); 564 (April 2020 report noting Plaintiff "denies

fever, sob, cough, chills, body aches, dysuria, hematuria, melena"); 591 (noting Plaintiff walks 20

minutes every other day); 609 (February 2021 exam noting Plaintiff was negative for joint pain and myalgia). The ALJ also noted that treatment notes following conservative treatment showed that Plaintiff could walk independently with a normal gait and exams showed normal strength, sensation, and range of motion throughout Plaintiff's extremities with no clubbing, cyanosis, edema, or deformity. AR 22; *see* 341 (September 2019 physical exam noting musculoskeletal findings as negative with "Overall – No Deformity. Gait – Normal. Rheumatoid Arthritis – Absent."); 387 (September 2019 report noting no acute distress, regular lungs and heart findings); 508-509 (December 2019 report noting "no edema BLE"); 536 (March 2020 report noting "Gait – Normal," no cyanosis); 551 (October 2020 exam report noting "no focal deficits, cranial nerves II-XII grossly intact with normal sensation, reflexes, coordination, muscle strength and tone"); 599 (January 2021 exam report noting "No LE edema," preserved sensation and strength, regular general, lungs, and heart findings); 607 (February 2021 report noting negative findings for claudication, edema, joint pain, myalgia).

Regarding Plaintiff's osteoarthritis and hand pain, the ALJ noted that Plaintiff received little medical treatment and had declined pain medication, missed rheumatology appointment referrals, and attended some physical therapy but also missed that. AR 23; 352 (March 2019 report noting Plaintiff had "newly diagnosed RA" and was started on Plaquenil); 500 (January 2020 report noting that Plaintiff "was referred to French Camp for Rheumatology over a year ago and did not show up to appointment. She would like to be rereferred;" and further noting Plaintiff complained "of bilateral hand pain, worse in the winter" but does "not want to take pain meds" and had "PT in the past that helped, but does not want to do it again anytime soon"); 503 (January 2020 report noting "Refer to rheumatology for RA management. Patient does not want to take pain meds."). Nevertheless, the ALJ also noted that medical records showed mild degenerative changes and findings regarding Plaintiff's hands were generally unremarkable. AR 351; 344; 341; 398; 502; 618.

Regarding Plaintiff's peripheral vascular disease, the ALJ noted that Plaintiff underwent an atherectomy of the right anterior tibial artery and tibial peroneal trunk, which was effective as Plaintiff subsequently denied numbness, tingling, and edema, and observations have shown no lower extremity edema. AR 23; 338 (September 2019 visit report "post atherectomy of the right anterior tibial artery

and tibial peroneal trunk," noting Plaintiff denied chest pressure or tightness, shortness of breath, leg swelling, orthopena, or paroxysmal nocturnal dyspnea); 391 (July 2019 report noting diagnosis of peripheral arterial occlusive disease); 344 (February 2019 visit report noting no swelling); 502 (February 2020 report noting "no pitting edema bilateral lower extremities" and normal general, lungs, and heart findings); 506-509 (December 2019 report noting normal general, lungs, and heart findings, and "no edema BLE"); 554 (June 2020 report noting "denies tingling, numbness, edema, chest pain, sob, fever, cough, melena, dysuria"); 593 (March 2021 report noting "No LE edema" and normal general, head, lungs, heart, neurologic, and psych findings); 599 (report noting "No LE edema," preserved sensation and strength, regular general, lungs, and heart findings); 607-609 (February 2021 report noting generally normal Echo/MUGA cardiovascular findings; Plaintiff denying chest pain, tightness, shortness of breath, presyncopal or syncopal attacks, or palpitations but some claudication symptoms after walking; and negative cardiovascular and vascular findings related to chest pain, diaphoresis, orthopnea, palpitation, syncope, PND, claudication, and edema).

Regarding Plaintiff's depression, the ALJ noted that Plaintiff regularly attends psychotherapy and takes psychotropic medication.  AR 23; *see* AR 339 (noting Fluoxetine prescription); 414 (January 2019 psychotherapy progress note noting "Major Depressive Disorder, Single episode, Severe" diagnosis and plan to use cognitive behavioral therapy, supportive therapy, and guided imagery to reduce symptoms).  The ALJ found this treatment effective, as mental status examinations showed Plaintiff was alert and oriented, appropriately groomed and dressed, cooperative, had a normal mood and affect, and exhibited appropriate behavior.  AR 23; 551; 593; 599; 609; 797.  The ALJ further noted that exams showed intact attention, concentration, and memory, and that Plaintiff denied areas of risk.  AR 23; 551; 605; 799; 801; 840.  The ALJ therefore appropriately examined Plaintiff's treatments and medication in assessing Plaintiff's symptoms testimony.

Plaintiff argues that the ALJ erred because the ALJ did not indicate what more aggressive treatment was appropriate for and available to Plaintiff and contends that even if Plaintiff's treatment were effective enough to enable her to perform light work, she would nonetheless be disabled.  (Doc. 16 at 18.)  However, Plaintiff does not provide authority suggesting that the ALJ must indicate what more aggressive treatment was appropriate for and available to Plaintiff.  Nor does Plaintiff's

reiteration of her other disability arguments undermine the ALJ's assessment of Plaintiff's symptoms testimony.  Plaintiff's arguments therefore do not demonstrate that the ALJ erred in assessing Plaintiff's symptoms testimony.

Accordingly, the Court concludes that the ALJ did not err in discounting Plaintiff's subjective complaints.

### CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, IT IS HEREBY ORDERED as follows:

1.      Plaintiff's motion for summary judgment (Doc. 16) is DENIED; and

2.      The Clerk of this Court is directed to enter judgment in favor of Defendant Martin O'Malley, Commissioner of Social Security and against Plaintiff Carrie L Huerta.

IT IS SO ORDERED.

Dated:   **March 27, 2024**                    /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE